UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CERCARE HEALTH, LLC,<br><br>      Plaintiff,<br><br>      v.<br><br>PHILIPS NORTH AMERICA, LLC,<br>TELCARE MEDICAL SUPPLY, LLC, and<br>BIOTELEMETRY, INC.,<br><br>      Defendants. | CIVIL ACTION<br>No. 24-11618-WGY |

YOUNG, D.J.                                    February 12, 2026

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

In this action, Plaintiff CerCare Health, LLC ("CerCare") claims that the Defendants, Philips North America, LLC, Telcare Medical Supply, LLC, and Biotelemetry, Inc. (collectively, "the Defendants") initially had an agreement whereby CerCare would resell the Defendants' diabetes testing products. At some point, CerCare was concerned about losing a deal with a large healthcare organization. Purportedly to save the deal, CerCare proposed that the Defendants directly contract with that organization, and that it act as an intermediary.

The Court earlier in this action dismissed the breach of contract, negligent misrepresentation, and unfair and deceptive

trade practice claims.[1]  What remains are two counts: Count III, promissory estoppel, and Count IV, unjust enrichment.

For the reasons stated below, the Defendants' Motion for Summary Judgment, ECF No. 67, is ALLOWED as to Count III, promissory estoppel, and ALLOWED in Part and DENIED in Part as to Count IV for unjust Enrichment, to the extent such claim cannot include claims for CerCare's purported lost profit damages.  The Defendants' motion to strike the jury trial as to the remaining claims ECF No. 75 is ALLOWED in part as to the remaining claim of unjust enrichment as there is no right to a jury on this claim, and DENIED in part as MOOT with respect to the dismissed promissory estoppel claim.  The Court reserves as to whether an advisory jury will be empaneled.

## II.  PROCEDURAL HISTORY

The Defendants move for summary judgment, accompanied by a memorandum of law, and supporting materials.  Defs.' Mot. Summ. J. ("the Motion"), ECF No. 67; Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), ECF No. 68.  CerCare opposes the motion, along with supporting materials.  Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 87.  The Defendants filed a reply

---

[1] This Court dismissed Counts I, II and V, when it allowed in part and denied in part the Defendants' Motion to Dismiss. See Elec. Clerk's Notes, ECF No. 34; Dec. 17, 2024 Tr. Mot. Dismiss, ECF No 36; Order, ECF No. 41; CerCare Health LLC v. Philips N. Am., LLC, No. CV 24-11618-WGY, 2025 WL 2164834 (D. Mass. Jan. 13, 2025).

brief.  Defs.' Reply Mem. Supp. Mot. Summ. J. ("Reply"), ECF No. 94.

Additionally, the Defendants move to strike the jury claim as to the remaining claims for promissory estoppel and unjust enrichment, which is also fully briefed.  Defs.' Mot. Strike Pl.'s Jury Demand ("Defs.' Mot. Strike"), ECF No. 75;  Defs.' Mem. Supp. Mot. Strike Pl.'s Jury Demand ("Defs.' Mem. Mot. Strike"), ECF No. 76; Opp. Defs.' Mot. Strike Pl.'s Demand Jury Tr. ("Opp'n Mot. Strike"), ECF No. 86.

## III. UNDISPUTED FACTS

The undisputed facts are taken from the Statement of Material Facts, ECF No. 69, as responded to in the Counter Statement, ECF No. 88 ("SUF ¶__") without quotations for readability.

CerCare is a wholly owned subsidiary of PENSA Health Management ("PENSA").  SUF ¶ 8.  Scot Giambruno ("Giambruno") is the principal of both PENSA and CerCare.  Id. ¶¶ 6,8.  CerCare's first contact with any of Defendants occurred in June 2019, when Giambruno emailed Bret Gautrau ("Gautrau") of Telcare/BioTel asking for an introductory call.  Id. ¶ 17.
In November 2020, CerCare and Telcare executed the Telcare Program Agreement ("Telcare Program Agreement").  SUF ¶ 20; see ECF No. 84-44.

## A.    The CerCare/Stax Agreement and the CerCare/Telcare Program Agreement

In June 2019, CerCare entered into a Services Agreement with Stax Solutions ("Stax") relating to a pilot program targeting the Atlanta VA diabetic patient population.  SUF ¶ 27. Fewer than thirty patients participated in the Atlanta VA pilot program.  Id. ¶ 28.

CerCare purchased blood glucose monitoring supplies and services from Telcare pursuant to the Telcare Program Agreement and provided those supplies and services to the Atlanta VA pilot program patients free of charge.  Id. ¶ 29.  Consistent with the agreed upon Telcare Program Agreement pricing, CerCare paid Telcare $100 for each blood glucose monitoring starter kit (BioTel Care BGM 4), $25 per box of blood glucose test strips (50 count), $4.99 per bottle of control solution, $9.99 for alcohol prep pads (100 count), $9.99 for lancets (100 count), and $20 per patient per month for monitoring and coaching services that CerCare purchased from Telcare for use in the Atlanta VA pilot program.  Id. ¶ 30.  CerCare understood that the coaching services were Telcare's "secret sauce" and their "huge value."  Id. ¶ 31.  In total, CerCare paid $16,902.91 to Telcare for the blood glucose monitoring supplies and services that CerCare purchased pursuant to the Telcare Program Agreement for use by the Atlanta VA pilot program patients.  Id. ¶ 32.

The $16,902.91 that CerCare paid to Telcare in connection with the Atlanta VA pilot program is the only money that CerCare ever paid to Telcare pursuant to the Telcare Program Agreement.  Id. ¶ 34.

On September 23, 2021, Telcare executed a Subcontractor Agreement with Stax relating to the Atlanta VA pilot program. Id. ¶ 35.  Before executing the Subcontractor Agreement with Stax, Telcare sent CerCare a copy of that Subcontractor Agreement.  Id. ¶ 36.  Stax has not made any payments to Defendants, pursuant to the September 2021 Subcontractor Agreement or otherwise.  Id. ¶ 38.

In January 2021, Amerigroup Georgia Managed Care Company ("Amerigroup Georgia"), CerCare and Telcare began discussing a potential pilot program targeting Amerigroup Georgia's population of Medicaid diabetic plan participants, where the "goal of the pilot would be to prove the concept and show Amerigroup the cost savings that can be derived" from the Telcare "diabetes management tool."  Id. ¶ 40.  Discussions among Amerigroup Georgia, CerCare and Telcare about a potential Medicaid Pilot Program continued during the summer of 2021.  Id. ¶ 41.  In September 2021, Amerigroup Georgia inquired about pricing for the program.  Id.

On September 22, 2021 and September 28, 2021, Giambruno and Gautrau of Telcare exchanged texts regarding pricing for the

Amerigroup Georgia Medicaid Pilot Program.  Id. ¶ 42.  In his September 22, 2021 and September 28, 2021 texts, Giambruno asked for Telcare's best pricing for the Amerigroup Georgia Medicaid Pilot Program.  Id. ¶ 43.

On September 29, 2021, Giambruno sent an email to Amerigroup Georgia attaching CerCare's "best and final pricing proposal for the Diabetes Pilot."  Id. ¶ 45.  In the cover email, Giambruno stated: "CerCare values the partnership and wants to do everything it can to ease the financial burden on Amerigroup during the Pilot period, so I have cut all the margin out of the pricing.  The goal is to show Amerigroup just how effective the program is in reducing A1c, hospitalizations, and improving HEDIS scores."  Id.  The representation made by Giambruno in his September 29, 2021 email to Amerigroup Georgia was accurate; CerCare did in fact "cut all the margin" out of the pricing it was offering to Amerigroup Georgia for the Medicaid Pilot Program.  Id. ¶ 46.

Amerigroup Georgia is a subsidiary of Anthem, Inc. ("Anthem"), which later changed its name to Elevance Health, Inc. ("Elevance").  Id. ¶ 47.  Anthem has at least 40 to 50 affiliated health plans across the United States, including Amerigroup Georgia; these health plans include commercial plans, Medicare plans, and Medicaid plans.  Id. ¶ 48.

## B.   Anthem Sends Proposed Agreement to CerCare

On October 8, 2021, Anthem sent CerCare a draft management services agreement ("MSA") to be used as the basis for a statement of work ("SOW") for the Amerigroup Georgia Medicaid Pilot Program under discussion.  Id. ¶ 50.  On October 19, 2021, CerCare emailed Gautrau the draft MSA that CerCare had received from Anthem on October 8, 2021.  Id. ¶ 54.  CerCare (and not any of the Defendants) is the one that first suggested the possibility of altering the MSA to substitute Telcare for CerCare as the contracting party.  Id. ¶ 55.

## C.   CerCare Proposes to Defendants a Different Arrangement with Anthem

On November 3, 2021, Giambruno stated, in a text to Gautrau: "I'm thinking we tweak the agreement to BioTel is the contracting agency offered through CerCare where I am the service/management side of things or something."  Id. ¶ 56.

On November 19, 2021, Giambruno stated in a text to Gautrau of Telcare/BioTel that CerCare had "positioned it" with Anthem that CerCare's "program is more off the shelf and there are more resources available through [BioTel] and given all the requirements - [BioTel] is better positioned to handle all of the 'stuff.'"  Id. ¶ 57.

CerCare did not bring any business to the Defendants that generated any revenues other than: (a) the Amerigroup Georgia Medicaid Pilot Program (which generated $389,961 in revenues, as discussed below); and (b) the $16,902.91 of supplies and services that CerCare purchased from Telcare for use in the Atlanta VA pilot program that was unrelated to the Anthem MSA. Id. ¶ 61. According to CerCare, it did not aggressively pursue introductions to other Anthem plans or affiliates because CerCare "didn't want to start that yet...[b]ecause [CerCare] was getting the runaround from [Defendants] about getting paid." Id. ¶ 62. CerCare had preliminary discussions with a few Anthem affiliates. Id. ¶ 63.

### D. Discussions/Negotiations Between CerCare and the Defendants

Giambruno claims that he told Defendants' representatives two or three times a month over the course of eighteen months that CerCare had potential opportunities with other Anthem plans "lined up and ready to go and go hard at," but that CerCare was not going to "waste any time" on them until the parties got CerCare's contract "done" so CerCare could "get paid." Id. ¶ 67.

On November 5, 2021, Gautrau sent CerCare a copy of Defendants' template broker agreement. Id. ¶ 68. On December 13, 2021, Gautrau emailed Giambruno the following, in its

[8]

entirety: "Following up on our recent discussion, the agreement that is being negotiated between Telcare Medical Supply, LLC, a Philips company, and Anthem, Inc. is an agreement that is being brokered through CerCare Health.  All parties agreed that a direct relationship between Telcare and Anthem was acceptable and the relationship originated with CerCare Health."  Id. ¶ 71.

On May 13, 2022, Giambruno emailed Defendants that he would "have my folks take a run at [a new draft agreement]."  In that email, Giambruno inquired whether Defendants would be interested in pursuing a structure that provided for a "monthly stipend or retainer" along with a "commission piece."  Wilson replied: "generally speaking, honestly, not in my experience."  Id. ¶ 74.

On August 1, 2022, Giambruno texted Josam Joffrion of Philips, asking: "Can we get this contract stuff squared away and put to bed?  How can we move it off the center line?"  Id. ¶ 75.

On August 11, 2022, Giambruno texted his wife that he had a good conversation with Jeremy Oswald of Simple Therapy about helping him grow that company.  Giambruno told his wife: "Might even consider selling off CerCare to Philips -- I'm tired of them dragging their feet on a co tract [sic]."  Id. ¶ 76.

On August 18, 2022, CerCare emailed its counsel expressing "irritat[ion]" at a lack of progress from Philips and stating: "We may end up wanting them to buy us out of the agreement

because it is too difficult to get anything done with them."
Id. ¶ 77.

On August 30, 2022, Giambruno emailed CerCare's counsel
that CerCare has "other opportunities I have had preliminary
discussions with and would like to proceed but the lack of
action on the agreement as well as other items is cause for
pausing things until we can get the agreement worked out."  Id.
¶ 78.

On November 10, 2022, Giambruno asked Defendants, "[c]an we
at least get a discussion going for the range of
comp[ensation]."  Id. ¶ 80.  CerCare wanted a 25% commission.
Id. ¶ 81.

On January 17, 2023, Giambruno emailed a PowerPoint
presentation to Joffrion. In that presentation, CerCare stated
that "[t]he goal in 2023 is to secure 3 additional Elevance
Health [Anthem] plans" beyond the Amerigroup Georgia pilot.  Id.
¶ 91.  CerCare did not secure business from any Anthem
subsidiaries or plans during 2023 or 2024.  Id. ¶ 92.

The January 17, 2023 PowerPoint that CerCare sent to the
Defendants identified Anthem plans in Texas and Nevada as
priority targets for 2023.  CerCare did not reach out to those
targets during 2023, however, because it was not satisfied with
the pace of discussions with the Defendants about a potential

new compensation agreement, so CerCare started "slow-playing it."  Id. ¶ 93.

On January 30, 2023, Giambruno texted Wilson: "I know there are lots of competing pressure right now but can the two of us sit down and hammer out the agreement?  There is so much opportunity to grow the business rapidly and I dont [sic] want to miss this prime opportunity."  Id. ¶94.

On February 6, 2023, Giambruno texted Joffrion that Giambruno is "getting antsy" about the potential new agreement because the "window is closing."  Id. ¶ 95.

On April 11, 2023, Giambruno emailed Joffrion "[l]et's get our deal done so we can capitalize" on a potential opportunity in Florida.  Id. ¶ 98.

On May 10, 2023, Giambruno texted Joffrion that CerCare no longer had "any faith" that a new agreement could get done, and that as a result, Giambruno would like to get CerCare's "departure wrapped up as quick as possible."  Id. ¶ 100.

On May 23, 2023, Giambruno texted Joffrion to ask if there has been any "movement from Nick or Legal on a departure settlement?"  Id. ¶ 101.

On June 7, 2023, Giambruno texted with CerCare consultant Bryan Barker about a potential opportunity with a Payer in Puerto Rico.  When Giambruno asked about the size of

the opportunity, Barker replied: "For Phillips? [sic] None. I'm
working with a couple of other vendors on that opportunity.  I
don't have a good feeling about Phillips [sic] after all that
we've done with no payment."  Id. ¶ 102.

On June 22, 2023, Barker texted Giambruno: "How did call go
about Phillips? [sic] I met with a group that could be a
challenger to Phillips [sic]."  Giambruno replied: "My lawyers
are preparing a letter – let's explore it."  Id. ¶ 103.

On July 25, 2023, Giambruno emailed Joffrion to ask if
there "has . . . been any movement at all" on a new agreement
and asking if he could "at least get some idea of the numbers[.]
I'm trying to be optimistic that we can get something done but
each passi[ng] month makes me wonder if we should pursue the
buyout/exit option."  Id. ¶ 104.

On September 1, 2023, CerCare's counsel, Will Prickett,
emailed Cody Cowper of Philips noting that the parties had been
discussing a potential new agreement for "well over a year" but
had not been able to complete an agreement.  Cowper emailed
Prickett on September 13, 2023, explaining that "[n]onemployee
'commission' payments in the healthcare space are potentially
very thorny from a compliance perspective" and thus his
"understanding [was] that the parties [had] been trying to find
a business arrangement that mitigate[d] [those] concerns," and
that he would "encourage" Giambruno "to be cognizant of those

issues in any proposals to the business" which "may help speed things up."  Prickett did not send over any proposed draft agreement, and the compensation terms and structure of the draft that CerCare had sent on December 6, 2022 remained unacceptable to the Defendants.  Id. ¶ 106.

On September 14, 2023, Giambruno texted Joffrion that since the parties had not been able to reach agreement on a consulting or broker agreement, Giambruno could instead become a Philips employee – "I'll take $1 a year salary."  Joffrion replied that he would pass it along.  Giambruno then replied the "flip side" is if Philips rejects that idea "what do we do?"  Id. ¶ 107.

On October 2, 2023, the Defendants' in-house counsel, Cowper, emailed CerCare counsel, stating that "I do not think it is fair to say" that the provisions in the draft agreement CerCare provided in December 2022 would be "consistent with [the Defendants'] healthcare compliance obligations."  Id. ¶ 108.

On October 24, 2023, Philips notified CerCare, during a telephone call with Giambruno, that the Defendants did not plan to move forward with any amendment or revised agreement.  The parties had not been able to agree on mutually acceptable terms. Id. ¶ 109.

On November 6, 2023, the Defendants emailed CerCare a proposed termination and release agreement that included a proposed termination payment of $10,000 from the Defendants to

CerCare.  Id. ¶ 110.  CerCare did not sign the proposed termination agreement, and did not make any counteroffer.  Id. ¶ 111.

### E.  Undisputed Facts Relating to Damages

Telcare and Anthem fully executed the MSA by May 2, 2022, and the MSA had an effective date of April 1, 2022.  Id. ¶ 112. Anthem did not exercise its option to extend the MSA.  Id. ¶ 114.  The defendants earned $389,961 in revenues from the Amerigroup Georgia Medicaid Pilot covered by SOW No. 1 from the inception of the pilot through its termination in August 2024. Id. ¶ 117.  The defendants incurred $185,091 in costs providing supplies and services for the Amerigroup Georgia Medicaid Pilot covered by SOW No. 1 from the inception of the pilot through its termination in August 2024.  Id. ¶ 118.  Defendants earned $204,870 in profits ($389,961 minus $185,091) from the Amerigroup Georgia Medicaid Pilot covered by SOW No. 1 from the inception of the pilot through its termination in August 2024. Id. ¶ 119.  Amerigroup Georgia ended the Amerigroup Georgia Medicaid Pilot Program because it did not have the funds to continue it past August 2024, as the original $400,000 that Amerigroup Georgia prepaid for the pilot was almost exhausted. Id. ¶ 120.

On April 19, 2024, the Defendants executed a second SOW No.
2 with Amerigroup Georgia for a maternal health pilot program
with the Georgia Department of Health (the "Georgia
Maternal Health Pilot").  Amerigroup Georgia subsequently
determined that the wrong person signed SOW No. 2 so the parties
executed an otherwise identical SOW with the correct signatory
on November 1, 2024.  Id. ¶ 121.

The Georgia Maternal Health Pilot arose through the
Defendants' government affairs team's efforts to fund remote
maternal health monitoring pilots.  The Georgia Maternal Health
Pilot includes three managed care organizations: Amerigroup
Georgia, CareSource, and Peach State.  The Defendants needed
separately to contract with each of those organizations because
the MSA was already in place with Anthem (Amerigroup Georgia's
parent) and the Amerigroup contract was structured as a SOW
pursuant to the MSA.  Id. ¶ 123.

SOW No. 2, for the Amerigroup Georgia piece of the Georgia
Maternal Health Pilot, has a not-to-exceed value of $135,000,
the maximum revenues Defendants can earn under
that SOW.  As of the filing of the motion, the Defendants have
earned well below that amount; as of the end of February 2025,
SOW No. 2 had generated $17,360 in revenues for Telcare.  Id. ¶
124.

The defendants expect to earn $32,400 in profits under SOW No. 2, approximately 24% of the total revenue under that SOW. Through February 2025, Philips had earned $4,214 in profits under SOW No. 2.  Id. ¶ 125.  The Defendants did not enter into any other SOWs pursuant to the MSA other than SOW No. 1 and SOW No. 2 with Amerigroup Georgia described above.  Id. ¶ 126.

In connection with the Amerigroup Georgia Medicaid Pilot, CerCare did not provide the supplies, enroll or communicate with patients, or provide monitoring or coaching.  All of those tasks were the responsibility of the Defendants.  Id. ¶ 127. At the time it filed its Complaint seeking lost profits damages, CerCare did not know how many patients were successfully enrolled in the Amerigroup Georgia Medicaid Pilot or how many patients stayed in the program, much less whether it generated any cost savings.  Id. ¶ 128.

When Amerigroup Georgia conducted audits relating to the Amerigroup Georgia Medicaid Pilot, it was the Defendants who had to provide the requested information.  CerCare's role was "somewhat of an intermediary."  Id. ¶ 129.

In February 2022, CerCare retained the law firm of Alston & Bird inter alia to assist CerCare in drafting a proposed new or amended agreement with the Defendants for CerCare to send to the Defendants for their consideration.  Id. ¶ 131.  CerCare has produced two invoices for legal fees it paid to Alston & Bird

relating to any potential new or amended agreement with Defendants, one for $11,153.50, and one for $4,927.50, for a total of $16,081.00.  Id. ¶ 132.

CerCare entered into a series of Consulting Agreements with Terminus Strategies, LLC ("Terminus") dated June 15, 2021, December 1, 2021, June 1, 2022, and December 1, 2022 (the "Terminus Agreements").  Id. ¶ 133.  CerCare has produced invoices showing that it paid $84,000 to Terminus for lobbying and consulting services in the state of Georgia rendered during the time period December 2021 through September 2023.  Id. ¶ 135.

CerCare has produced invoices showing that it was billed $77,500 by Rubin Turnbull for lobbying and consulting services relating to the VA during the time period February 2022 through May 2023.  Id. ¶ 138.  By letter from counsel on April 11, 2025, CerCare told the Defendants that "except for CerCare's lobbying and Alston & Bird fees . . . CerCare has decided to withdraw its claim for out of pocket damages/expenses."  CerCare's claimed lobbying costs and Alston & Bird fees total $177,581.  Id. ¶ 139.

## IV.  ANALYSIS

The Defendants argue that the remaining counts for promissory estoppel and unjust enrichment fail as matter of law. For the reasons stated below, the Defendants' Motion for Summary

.

Judgment, ECF No. 67, is ALLOWED as to Count III for Promissory Estoppel, and ALLOWED in Part and DENIED in Part as to Count IV for Unjust Enrichment, inasmuch as that latter claim cannot include claims for CerCare's purported lost profit damages.

### A.    Standard of Review

It is well-settled that "a court can grant summary judgment 'only if the record, construed in the light most amiable to the nonmovant, presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" United States ex rel. Omni Healthcare Inc. v. MD Spine Sols. LLC, 160 F.4th 248, 257 (1st Cir. 2025) (quoting Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018)); see Fed. R. Civ. P. 56(a).  "The party 'seeking summary judgment must, at the outset, inform the court of the basis for its motion and identify the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact.'"  Id. at 258 (quoting Irobe, 890 F.3d at 377).  If the moving party "'crosses this modest threshold,' it becomes the nonmoving party's duty to, 'with respect to each issue on which it would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in its favor.'"  Id.  It is a rigorous burden: "[t]o avoid the axe, the

nonmovant must identify 'significantly probative evidence
favoring' its position.'"   Id.

**B.   Promissory Estoppel**

The elements of promissory estoppel under Massachusetts law
are similar to breach of contract, but without the element of
consideration.  "When a promise is enforceable in whole or in
part by virtue of reliance, it is a 'contract,' and it is
enforceable pursuant to a 'traditional contract theory'
antedating the modern doctrine of consideration." Loranger
Const. Corp. v. E. F. Hauserman Co., 376 Mass. 757, 761 (1978).
Under Massachusetts law, "[t]o prevail on a promissory estoppel
claim, [CerCare] must show (1) a representation intended to
induce reliance; (2) reasonable reliance on that representation;
and (3) resulting detriment."  Tody's Serv., Inc. v. Liberty
Mut. Ins. Co., 496 Mass. 197, 201 (2025).  Notably, "because
promissory estoppel is equivalent to a contract action, all
elements of a contract other than consideration must be
established."  Id. (citation and quotations omitted).  "Reduced
to basic terms, promissory estoppel 'consists simply of a
promise that becomes enforceable because of the promisee's
reasonable and detrimental reliance.'"  Suominen v. Goodman
Indus. Equities Mgmt. Grp., LLC, 78 Mass. App. Ct. 723, 731
(2011) (quoting Rooney v. Paul D. Osborne Desk Co., 38
Mass.App.Ct. 82, 83 (1995).

The Defendants argue that they are entitled to judgment as matter of law because CerCare cannot prove any of the above elements and that, as to damages, the lost profits claim fails, and at most it is entitled to out-of-pocket expenses.  An enforceable promise must be **unambiguous**.  For example, "statements of intent or agreements to negotiate" are "not unambiguous promises." Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 585 (2024).  "[A]s with a claim for breach of contract, [in] order to establish the existence of an enforceable promise under promissory estoppel, the plaintiff must show that the defendants' promise included **enough essential terms** so that a contract including them would be capable of being enforced." Lan Glob., Inc. v. Alchemy Telco Sols. US, LLC, No. 22-CV-11732-AK, 2023 WL 5978296, at *12 (D. Mass. July 6, 2023) (alteration in original) (emphasis added) (quoting Armstrong v. Rohm and Haas Co., Inc., 349 F. Supp. 2d 71, 82 (D. Mass. 2004), report and recommendation adopted, No. 22-CV-11732-AK, 2023 WL 5978297 (D. Mass. Aug. 25, 2023)).

As this Court wrote in 2011, the promise must be unambiguous because otherwise the Court would be impermissibly creating the terms of a contract that did not exist:

> Thus, even where detrimental reliance acts as a substitute for consideration, the promise on which a claim for promissory estoppel is based must be interchangeable with an offer "in the sense of 'commitment.'" Cataldo Ambulance Serv., Inc. v. City

of Chelsea, 426 Mass. 383, 386 n. 6, 688 N.E.2d 959
(1998).  The promise must demonstrate "an intention to
act or refrain from acting in a specified way, so as
to justify a promisee in understanding that a
commitment has been made." Varadian, 419 Mass. at
849-50 (quoting Restatement (Second) of Contracts § 2
(1981)).  That the representation is of future, rather
than present, intention will not preclude recovery, so
long as the promisor's expectation to be legally bound
is clear.  See Sullivan v. Chief Justice for Admin. &
Mgt. of Trial Court, 448 Mass. 15, 28 & n. 9 (2006)
(quoting Boylston Dev. Group, Inc. v. 22 Boylston St.
Corp., 412 Mass. 531, 542 n. 17 (1992)).

In addition to demonstrating a firm commitment,
the putative promise, like any offer, must be
sufficiently "definite and certain in its terms" to be
enforceable.  Moore v. La-Z-Boy, Inc., 639 F.Supp.2d
136, 142 (D.Mass.2009) (Stearns, J.) (quoting Kiely,
914 F.Supp. at 712).  "[I]f an essential element is
reserved for the future agreement of both parties, as
a general rule, the promise can give rise to no legal
obligation until such future agreement." 1 Richard A.
Lord, Williston on Contracts § 4:29 (4th ed. 1990);
see Lucey v. Hero Int'l Corp., 361 Mass. 569, 574-75,
281 N.E.2d 266 (1972).  Under well-settled
Massachusetts law, "an agreement to enter into a
contract which leaves the terms of that contract for
future negotiation is too indefinite to be enforced."
Caggiano v. Marchegiano, 327 Mass. 574, 580, 99 N.E.2d
861 (1951); see Sax v. DiPrete, 639 F.Supp.2d 165, 171
(D.Mass.2009) (Stearns, J.); Moore, 639 F.Supp.2d at
142; In re Harvey Probber, Inc., 50 B.R. 292, 296-97
(Bankr.Mass.1985); Lafayette Place Assocs. v. Boston
Redevelopment Auth., 427 Mass. 509, 517, 694 N.E.2d
820 (1998); Bell v. B.F. Goodrich Co., 359 Mass. 763,
763, 270 N.E.2d 926 (1971); Air Tech. Corp. v. General
Elec. Co., 347 Mass. 613, 626, 199 N.E.2d 538 (1964);
Rosenfield v. United States Trust Co., 290 Mass. 210,
217, 195 N.E. 323 (1935); Restatement (Second) of
Contracts § 33, comment (c) ("The more terms the
parties leave open, the less likely it is that they
have intended to conclude a binding agreement.").

The longstanding reluctance of courts to enforce
open-ended "agreements to agree" reflects a belief
that, unless a "fall-back standard" exists to supply

the missing terms, there is no way to know what ultimate agreement, if any, would have resulted.  E. Allan Farnsworth, <u>Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations</u>, 87 Colum. L.Rev. 217, 255-56 (1987).  It is the vague and indefinite nature of that potential final agreement-not the preliminary agreement to agree—that troubles courts.  <u>See</u> <u>Armstrong</u> v. <u>Rohm & Haas Co., Inc.</u>, 349 F.Supp.2d 71, 78 (D. Mass. 2004) (Saylor, J.) (holding that an agreement must be sufficiently definite to enable courts to give it an exact meaning).  Judges are justifiably unwilling to endorse one party's aspirational view of the terms of an unrealized agreement.  <u>See</u> <u>Farnsworth</u>, <u>supra</u> at 259.  Just as "[i]t is no appropriate part of judicial business to rewrite contracts freely entered into," <u>RCI Northeast Servs. Div.</u> v. <u>Boston Edison Co.</u>, 822 F.2d 199, 205 (1st Cir.1987), courts must not force parties into contracts into which they have not entered freely, <u>Armstrong</u>, 349 F.Supp.2d at 80 (holding a promise unenforceable where the court could not "supply the missing terms without 'writing a contract for the parties which they themselves did not make'" (quoting <u>Held</u> v. <u>Zamparelli</u>, 13 Mass.App.Ct. 957, 958, 431 N.E.2d 961 (1982))).

Moreover, parties ought be allowed to step away unscathed if they are unable to reach a deal.  <u>Cf.</u> <u>R.W. Int'l Corp.</u> v. <u>Welch Food, Inc.</u>, 13 F.3d 478, 484-85 (1st Cir.1994).  To impose rights and duties at "the stage of 'imperfect negotiation,'" <u>Lafayette Place Assocs.</u>, 427 Mass. at 517, would be to interfere with the liberty to contract--or not to contract.  Thus, the concern is that if a court were to order specific performance of an agreement to agree, where the material terms of the final agreement were left open by the parties, not only would there be "little, if anything, to enforce," <u>Lambert</u> v. <u>Fleet Nat'l Bank</u>, 449 Mass. 119, 123, 865 N.E.2d 1091 (2007), but also future negotiations would be chilled.  <u>Cf.</u> <u>American Broad. Cos., Inc.</u> v. <u>Wolf</u>, 52 N.Y.2d 394, 438 N.Y.S.2d 482, 420 N.E.2d 363, 368-69 (1981) (denying request for specific performance of general contract negotiation clause as inhibitive of free competition).

Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 340-42 (D. Mass. 2011).

The Defendants argue there was no promise, or if there was it was so ambiguous as to not be actionable. Defs.' Mem. 6-10. Specifically, they argue there were no written promises, that the alleged oral promises were insufficient, and that the written correspondence supports no more than an unenforceable agreement to negotiate. Id.; see Sunningdale Ventures, Inc. v. Martin, No. CV 13-12512-DPW, 2018 WL 1582554, at *10 (D. Mass. Mar. 31, 2018) (Woodlock, J) ("[A]n agreement-to-agree later is unenforceable . . . At most, [the Defendant] promised [the Plaintiff] that it would agree to negotiate over a later modification. Under Massachusetts law, this is too vague to be enforced, even under a theory of detrimental reliance. A court would have to write all the essential terms of the modified loan agreement into the purported contract in order to reach the result Martin seeks.").

CerCare argues that the evidence demonstrates "not **whether** CerCare would be compensated or **how** much, but rather what was the best option to **achieve** the **compensation levels the Philips Defendants promised to pay** Cercare for the levels of business it brought to Defendants." Pl.'s Opp'n 6 (emphasis in original). In sum, the Cercare argues that the Telcare Agreement was the

base line for a new agreement.  Id. 6-13.  CerCare has

submitted, among other evidence, an affidavit as to the promise:

> The promises **to pay** CerCare **at the same levels**,
> for the same amount of business I generated, **under the
> Telcare Agreement** were made orally to me on multiple
> occasions by several Philips employees, including
> Josam Joffrion, Nick Wilson, and David Bliss. While I
> cannot recall the exact date on which each of these
> employees made these promises to me, I do recall a
> specific meeting with Philips employees in Boston,
> Massachusetts on April 22, 2022.  At that meeting, Mr.
> Joffrion, Mr. Wilson and Mr. Bliss repeated this
> promise to me and Wilson assured me, once again, that
> Philips would sign the revised agreement, which would
> confirm those promises in a written agreement.

Aff. Scott Giambruno ("Giambruno Aff.") ¶ 18 (emphasis added),

ECF No. 90.

This, and similar statements and communications, are simply

not enough.  "Whether an alleged agreement is sufficiently

definite to be judicially enforced is a fact-based inquiry which

depends upon the nature of the underlying agreement and the

alleged terms."  Lan Glob., Inc., 2023 WL 5978296, at *13.  The

simpler the deal, the fewer terms; for example, a property

rental might require price and duration.  Id.  More complex

deals require more detail.  Id.

Here, the underlying Telcare Program Agreement does **not** set

any revenue, but rather just provides a commitment to sell to

CerCare, and for CerCare to pay Telcare for the products it

purchases.  Cercare argues that the "Defendants promised to

preserve CerCare's compensation at the same level as under the

[24]

Telcare Program Agreement and consistent with the expected
compensation levels from that Agreement."  Pl.'s Opp'n 13.  As
the Defendants argue, however, "the Telcare Agreement does not
provide for **any** payments to CerCare, and put the onus on CerCare
to negotiate contracts with Payers at high enough prices to earn
any profits from selling the products and services CerCare would
purchase from Telcare."  Reply 1.  Furthermore, while the
Telcare Program Agreement may have been a baseline, the redline
and proposed by Cercare agreement was essentially an entirely
different agreement.  See ECF No. 84-25 13-38; 39-50.

     Even taking all reasonable inferences in favor of CerCare,
while the parties **may** have intended to enter into a new
arrangement, the evidence demonstrates an agreement to negotiate
a new agreement.  Indeed, as here, "[w]hen the core terms of an
alleged promise have not yet been specified, there is no
reliable basis upon which the Court could go about filling in
the missing terms."  Lan Glob., Inc., 2023 WL 5978296, at *14.
Accordingly, no reasonable jury could conclude that the
Defendants made an **unambiguous** promise.  Promissory estoppel
fails as matter of law.

     C.  **Unjust Enrichment**

     Under Massachusetts law, "[t]o succeed on an unjust
enrichment claim," CerCare has the burden of demonstrating "that
(1) it 'conferred a measurable benefit' on the defendant, (2) it

'reasonably expected compensation,' and (3) 'the defendant[s]

accepted the benefit with knowledge' of that reasonable

expectation." Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496

Mass. 197, 200 (2025) (quoting Columbia Plaza Assocs. v.

Northeastern Univ., 493 Mass. 570, 589 (2024)).  The Defendants

argue that "CerCare cannot demonstrate that the limited profits

the Defendants earned from business referred to them by CerCare

were obtained by Defendants at CerCare's expense.  Defs.' Mem.

18-19.  As CerCare argues, "[a]t a minimum, a genuine issue of

material fact exists concerning whether CerCare had a reasonable

expectation of compensation during the period before Defendants

informed CerCare they would not be moving forward with the new

agreement to document their promises to compensate CerCare,

precluding summary judgment."  CerCare Opp'n 17 (citing Crosby

Legacy Company, LLC v. TechnipFMC PLC, No. CV 18-10814-NMG, 2025

WL 1071628, at *11 (D. Mass. Feb. 6, 2025), report and

recommendation adopted, No. 18-CV-10814, 2025 WL 700301 (D.

Mass. Mar. 5, 2025), and report and recommendation adopted, No.

CV 18-10814-NMG, 2025 WL 2937099 (D. Mass. Oct. 15, 2025)).

    CerCare has the better of it here.  A fact finder can

decide the contours of the expectations of payment for the

assistance in getting Anthem on board.  Count IV therefore

survives summary judgment.  The Defendants correctly argue in

the alternative, however, that damages cannot include **CerCare's**

lost profits.  Defs. Mem. 19-20 (citing Massachusetts Eye & Ear
Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 67 (1st
Cir. 2009) ("[A] plaintiff may not recover her own lost profits
through an unjust enrichment claim . . . .")).  Accordingly,
damages if any under this count, must exclude CerCare's lost
profits.

## V. MOTION TO STRIKE JURY CLAIM

The Defendants motion to strike the jury claim is ALLOWED
in Part as to unjust enrichment, with the Court reserving the
right to empanel an advisory jury,[2] and DENIED as MOOT as to the
dismissed promissory estoppel claim.

While the First Circuit has not ruled definitively on the
issue, this Court has previously ruled that "there is no Seventh
Amendment right to a jury solely on the basis of [an unjust
enrichment] claim." Massachusetts Eye & Ear Infirmary v. QLT,
Inc., 495 F. Supp. 2d 188, 193 (D. Mass. 2007), aff'd in part,
vacated in part sub nom. Massachusetts Eye & Ear Infirmary v.
QLT Phototherapeutics, Inc., 552 F.3d 47 (1st Cir. 2009),

---

[2] Even where no right to a jury trial may attend, the
Defendants concede that the Court may employ an advisory jury to
the Court, citing this Court's decision Moitoso v. FMR LLC, 410
F. Supp. 3d 320, 322 (D. Mass. 2019) for the proposition that
"anything a judge can do a jury can do better."  Defs.' Mem.
Mot. Strike 1; see Fed. R. Civ. P. 39(c)(1) ("In an action not
triable of right by a jury, the court, on motion or on its own:
. . . may try any issue with an advisory jury . . . .")

decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir.
2009).

    The First Circuit appears to agree, though it is unclear
whether this was dicta when it stated that "it is undisputed
that the unjust enrichment count does not require a jury trial"
in Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 97
(1st Cir. 2014).  CerCare argues that the remedy is nevertheless
legal in nature and tries to distinguish these cases because
they did not include "legal damages claims."  Opp'n Mot. Strike
4 n. 1.  CerCare attempts to buttress the legal nature of its
claims with lost profit damages, but those damages are not
available in an unjust enrichment case.  The Court is
unpersuaded.  CerCare does not have a jury claim as matter of
right.

**VI.  CONCLUSION**

    For the reasons stated above, the Defendants' Motion for
Summary Judgment, ECF No. 67, is hereby ALLOWED in Part as to
Count III Promissory Estoppel and DENIED in Part as to Count IV
for Unjust Enrichment, but such claim cannot include claims for
CerCare's purported lost profit damages which are impermissible.

    The Defendants' motion to strike the jury trial as to the
remaining claims, ECF No. 75, is ALLOWED in part as to the
remaining claim of unjust enrichment, and DENIED in part as MOOT

with respect to the dismissed promissory estoppel claim.[3]

     **SO ORDERED.**

                               *William G. Young*
                            WILLIAM G. YOUNG
                                JUDGE
                              of the
                        UNITED STATES[4]

---

    [3]  The Court reserves as to whether to empanel an advisory jury.  <u>See</u> Fed.R.Civ.P. 39(c)(1)

    [4]  This is how my predecessor, Peleg Sprague (D. Mass 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.